UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

246 SEARS ROAD REALTY CORPORATION,

                Plaintiff,

       -against-

EXXON MOBIL CORPORATION,

                Defendant.

-------------------------------------------------------------------X

**MEMORANDUM AND ORDER**

09-CV-889 (NGG) (JMA)

APPEARANCES:

Richard W. Young
Patrick F. Young
Young & Young, LLP
863 Islip Avenue
Central Islip, New York 11722
      *Attorneys for Plaintiff*

Beth L. Kaufman
Deirdre J. Sheridan
Schoeman, Updike & Kaufman, LLP
60 East 42nd Street
New York, NY 10165
      *Attorneys for Defendant*

**AZRACK**, **United States Magistrate Judge:**

      This case concerns a dispute between plaintiff 246 Sears Road Realty Corp. ("plaintiff")

and defendant Exxon Mobil Corp. ("Exxon") stemming from Exxon's lease of a gasoline service

station from plaintiff and Exxon's subsequent remediation of a fuel spill on the property. After

Exxon's lease ended in May 2004, the parties entered into extensive negotiations regarding an

agreement that would permit Exxon to access the property in order to conduct the remediation.

That agreement (the "Access Agreement") was signed on December 1, 2005, and Exxon

completed its remediation efforts in December 2008. In March 2009, plaintiff filed suit against

Exxon alleging that Exxon, through its acts and omissions during its tenancy and the subsequent remediation, breached its obligations under the lease and Access Agreement.

Presently before the Court is plaintiff's motion to amend its complaint to add fraud claims based on Exxon's failure to disclose information both before and after the execution of the Access Agreement. The Honorable Nicholas G. Garaufis referred this motion to me for decision. ECF No. 79.

Plaintiff's proposed fraud claims focus on a provision in the Access Agreement that called for plaintiff to purchase certain underground storage tanks from Exxon. Plaintiff alleges that Exxon failed to disclose information about those tanks and the remediation in an attempt to shift the costs of the remediation to plaintiff.

As explained below, plaintiff's motion to amend its complaint is denied. For the majority of plaintiff's proposed fraud allegations, plaintiff cannot show good cause for raising these claims seven months after a court-ordered deadline for amending the pleadings. Moreover, not only is plaintiff's proposed complaint futile, but undisputed evidence offered by Exxon also indicates that plaintiff's proposed claims are meritless.

## I. FACTUAL BACKGROUND

### A. The Spill and Remediation

The following facts are taken from plaintiff's proposed amended complaint ("PAC") and the attached exhibits. Decl. of Richard W. Young in Supp. of Pl.'s Mot. to Amend ("Young Decl."), ECF Nos. 72–75.

#### 1. Events Leading up to Execution of the Access Agreement

Plaintiff is owned by Natale ("Nat") and Anthony Castagna. PAC ¶ 9. In 1984, Exxon leased a parcel of land in Brooklyn ("the premises") from plaintiff for use as a gasoline service

station.  Id. ¶ 4.  The premises had been operating as a gasoline service station since the 1940s.
Id. ¶ 6.

A variance from the City of New York allowed plaintiff to operate a gasoline and service station on the premises.  Id. ¶ 7.  However, the variance would be lost if a gasoline station was not operated at the premises for a continuous period of two years.  Id. ¶ 8.

During Exxon's lease, the premises contained eleven underground storage tanks ("USTs").  Id. ¶ 11.  There were three 3,000-gallon USTs and eight 550-gallon USTs (collectively the "Small Tanks") as well as five 4,000-gallon USTs (the "Large Tanks").  Id. ¶¶ 11–12.  During its tenancy, Exxon used the Large Tanks, which were registered to Exxon. Id. ¶¶ 12, 82.  The Small Tanks, which had been de-registered, were never used by Exxon.  Id. ¶¶ 11, 82.  The premises also contained lines and piping associated with USTs, as well as two underground oil tanks that stored used motor oil and fuel oil to heat the building on the premises. Id. ¶ 13.  Exxon operated a gas station on the premises until May 14, 2004, when its lease expired.  Id. ¶ 21.  According to the lease, when Exxon surrendered the premises, the premises had to be "in as good condition as" when the lease began.  Id. ¶ 14.

At some point during Exxon's tenancy, the premises became contaminated by motor vehicle fuel.  Id. ¶¶ 17, 19.  In March 1990, New York State Department of Environmental Conservation ("DEC") assigned the premises a "SPILL REPORT," which would remain open until December 2008.  Id. ¶¶ 18, 113; Dep. of John Durnin[1] ("Durnin Dep.") 164, Young Decl., Ex. F.  Plaintiff alleges that Exxon was obligated to remediate this contamination.  PAC ¶ 19.

In April 2003, DEC conducted an on-site inspection of the premises, which identified several violations concerning the USTs and accompanying lines.  Id. ¶¶ 22–25; Sept. 3, 2003 Ltr.

---

[1]  Durnin is a Professional Engineer in the Division of Environmental Remediation at DEC.  PAC ¶ 50.

from DEC to Exxon ("Sept. 3, 2003, Ltr."), Young Decl., Ex. E; Notice of Violation, Young Decl., Ex. E.  In June 2003, DEC inspectors were scheduled to inspect the premises again.  PAC ¶ 30.  In September 2003, DEC issued Exxon a Notice of Violation directing Exxon to correct the above violations.  Id. ¶ 30; Notice of Violation; Sept. 3, 2003, Ltr.

Around the same time as DEC's April 2003 inspection, on-site monitoring wells, which had been installed on the property, revealed contaminants, and Exxon was finding an increase in "gasoline constituents" in the groundwater.  PAC ¶¶ 26-27.  In November 2003, Exxon issued a status report update for the premises, indicating that 1,131 gallons of contaminated water had been removed and that Exxon would continue quarterly groundwater sampling.  Id. ¶ 31.

In January 2004, DEC approved Exxon's work plan for the premises, which provided for, inter alia, the installation of off-site monitoring wells to determine the extent of the contamination.  Id.; Jan. 15, 2004, Ltr. from John Durnin to Melissa Winsor,[2] Young Decl., Ex. G.  That same month, Exxon compared the costs of bringing the USTs into compliance versus removing them, and decided to proceed with a remediation plan that involved removing the USTs and other equipment on the premises.  PAC ¶ 37.  Exxon was aware that if the USTs were removed, plaintiff would no longer be able to operate the Premises as a gasoline station and that

---

[2]  Winsor was Exxon's Remediation Territory Manager.  PAC ¶ 28.  At some point during the relevant events, Winsor's last name changed to Tacchino.  For ease of reference, she is referred to throughout as "Winsor."

Exxon "could lose its Certificate of Occupancy."[3] Id. ¶ 39. Exxon allegedly failed to disclose to plaintiff its plan to remove all of the USTs. Id. ¶ 40.

In February 2004, Exxon notified plaintiff that it would not renew the lease and instead proposed that plaintiff and Exxon enter into an access agreement that would enable Exxon to remain on the premises to perform remediation operations. Id. ¶ 20.

On March 26, 2004, Nat Castagna contacted Geological Services Corporation ("GSC"), Exxon's consultant in charge of the remediation project, in an attempt to obtain information about the premises. Id. ¶ 34. At the time, Nat Castagna was not aware that there was an active environmental case at the site. Id. ¶ 44.

On March 30, 2004, an employee at GSC advised Maria Kobe, an Exxon employee, that he was making copies of environmental reports and asked whether he should send copies to Nat Castagna. Id. ¶ 46. Although Kobe responded that Castagna's requests should be directed to her and that she would forward the reports to Castagna, neither she nor Winsor, Exxon's Remediation Territory Manager, ever forwarded the reports or any other documents filed with DEC to Castagna. Id. ¶¶ 28, 47–48.

Beginning in May 2004, the parties engaged in "extensive negotiations," which would culminate in the signing of the Access Agreement on December 1, 2005. Id. ¶¶ 71–72.

---

[3] In its reply brief, plaintiff offers additional evidence regarding the variance and Certificate of Occupancy issued by New York City that permitted the premises to be used as a gasoline service station. Decl. of Richard W. Young in Further Supp. of Pl.'s Mot. for Leave to Amend ("Young Reply Decl.") ¶ 2, ECF No. 77. According to plaintiff, if the premises were not used as a gasoline service station for two continuous years, both the variance and the Certificate of Occupancy would lapse. Id. (discussing both Certificate of Occupancy and variance); PAC ¶ 8 (discussing only variance). The triggering event for the commencement of this two year period appears to have been either: (1) when Exxon stopped dispensing gasoline on the premises (which occurred in May 2004); or (2) when Exxon removed the USTs (which, as explained infra, occurs in August 2007). See Email dated June 4, 2004, Young Reply Decl., Ex. A; Emails Dated June 29, 2005, Young Reply Decl., Ex. A; May 30, 2008 Ltr. from Architect Adam Vassalotti to Kramer, Young Reply Decl., Ex. A.

In a letter dated August 30, 2004, Durnin informed Winsor that although the concentrations of groundwater contamination on the premises had decreased over the past twelve years, contamination was still present.  Id. ¶ 50; Aug. 30, 2004, Ltr. from Durnin to Winsor ("Aug. 30, 2004, Ltr.") Young Decl., Ex. K.  The letter goes on to state that "[t]here is a potential that some or all" of the USTs on the premises "could be contributing to the groundwater contamination" and that "[t]he source of this contamination must be identified and removed." Aug. 30, 2004 Ltr.  Exxon was directed to prepare a Corrective Action Plan ("CAP"), which would have to be approved by DEC and would lead to "the closure of the site."[4]  Id.  Although Exxon had previously proposed continuing groundwater monitoring and sampling, Durnin informed Winsor that monitoring alone would not be sufficient.  Id.

Between September 2004 and March 2005, DEC and Exxon exchanged a series of letters. In September 2004, GSC submitted a proposed CAP to DEC that provided for closure and removal of all USTs and piping on the premises "as approved by the property owner."  PAC ¶ 53.  On November 4, 2004, Durnin advised Winsor that Exxon was required to submit an Underground Storage Tank Divestiture Plan ("USTDP") for removal of the USTs.  Id. ¶ 54.  On December 10, 2004, GSC submitted the USTDP, which called for removal of all the USTs and accompanying lines.  Id. ¶ 56.  The USTDP provided that removal of all tanks was subject to approval of the "property owner."  Id. ¶ 57.  On March 14, 2005, GSC submitted a remediation schedule for the CAP that incorporated certain modifications that DEC had requested.  Id. ¶ 59.

---

[4]  Plaintiff asserts that "[t]he documents . . . reveal that Exxon was on notice that [DEC] was mandating that the Premises be shut down due to contamination."  Pl.'s Mem. in Supp. of Mot. for Leave to File Am. Compl. ("Pl.'s Mem.") at 18, ECF No. 72 (emphasis added).  Plaintiff provides no citation for this proposition, which presumably refers to the Aug. 30, 2004, letter's statement regarding "closure of the site."  When the August 30, 2004, letter is read in its entirety, it becomes clear that Durnin is discussing the closure of DEC's ongoing "Spill" inquiry and not the premises, per se.  See Aug. 30, 2004, Ltr. (stating that if report that Exxon will prepare as part of remediation indicates that "all the contamination has been removed from both on-site and offsite, [Exxon should] request [DEC] to close the open Spill at this site"); id. (stating that if report "indicates that there is residual contamination remaining at the site, perform an on-site and off-site exposure assessment to determine if this Spill site can be closed.")

On March 29, 2005, Durnin advised Exxon that DEC had approved the CAP and USTDP. Id. ¶ 60; Mar. 29, 2005 Ltr. from Durnin to Winsor, Young Decl., Ex. L.

In an internal Exxon email dated April 21, 2005, Joanne Wallach, an Exxon employee, wrote:

> Recommend waiting for the [DEC] attorney (Lou Oliva) to contact [plaintiff's] attorney regarding access, before placing a dealer under agreement to re-open. The [DEC] is only going to discuss granting [Exxon] access to the site, not requiring the tanks to be removed. We should hear back in a week. Ultimately, it is a business decision to re-open or pull tanks. If the [DEC] places pressure on the [plaintiff] for access, maybe the [plaintiff] will want to have the tanks removed.

PAC ¶ 64.

Between April and June 2005, Exxon compared the costs of two different remediation plans. Id. ¶¶ 65, 68. One plan, estimated to cost $800,000 to $850,000, did not involve the removal of any of the USTs. Id. ¶ 65; May 11, 2011, Email, Young Decl., Ex. M; May 12, 2011, Email, Young Decl., Ex. M. Instead, under that plan, a remediation system would be installed that would require Exxon to monitor the premises over a period of eight to ten years ("remediation system plan"). PAC ¶ 65; May 11, 2011, Email. This plan would have allowed the premises to remain operating as a gas station. PAC ¶ 65. The other plan, which would last six months and cost $350,000, involved removal of all the USTs and excavation of the soil ("UST removal plan"). Id. ¶ 66. Plaintiff alleges that this plan would have rendered the premises vacant and no longer operational as a gasoline service station. Id. Plaintiff further alleges that, although Exxon was aware of this fact, "Exxon chose" the UST removal plan as it was less costly for Exxon. Id. ¶ 67.

2. *Omissions*

Plaintiff alleges that, prior to the execution of the Access Agreement in December 2005, Exxon failed to disclose to plaintiff numerous pieces of information discussed above. PAC ¶¶ 51, 62, 63, 68, 135. Specifically, plaintiff claims that prior to the execution of the Access Agreement, Exxon should have disclosed: (1) the extent of the contamination on the premises ("Omission #1")[5]; (2) that DEC had approved the CAP and USTDP submitted by Exxon ("Omission #2"); (3) that the lines were faulty and the subject of a Notice of Violation issued by DEC ("Omission #3"); (4) that plaintiff's permission was necessary pursuant to the approved CAP and USTDP before any remediation could begin ("Omission #4"); (5) information about the two alternative remediation options that Exxon compared between April and June 2005 ("Omission #5"), id. ¶¶ 65–66; and (6) that Exxon had chosen the remediation plan that involved removal of all of the USTs and that would render the premises vacant and no longer operational as a gasoline service station ("Omission #6"). Plaintiff also alleges that Exxon failed to disclose information contained in a July 14, 2006, letter from Durnin to Winsor ("Omission #7"), which is discussed more fully infra. Id. ¶¶ 95, 97. In sum, the PAC alleges that Exxon's failure to disclose the information above constitutes fraud.

3. *Access Agreement Signed in December 2005*

On December 1, 2005, plaintiff and Exxon finally signed the Access Agreement that they had been negotiating since May 2004. Id. ¶¶ 71–72. Plaintiff was represented by an attorney, Leonard Kramer. See id. ¶¶ 64, 73, 98.

---

[5] Most, if not all, of the information regarding the extent of contamination appears to have been contained in formal written correspondence between DEC and Exxon (or Exxon's agents). In fact, DEC's August 30, 2004, letter, which is attached to the PAC, included the most recent information on the extent of the contamination prior to the execution of the Access Agreement in December 2005. Aug. 30, 2004, Ltr.

The Access Agreement granted Exxon access to the premises for the purpose of conducting environmental testing and/or remediation operations. Access Agreement at 1. In return, Exxon was required to pay plaintiff $13,750 per month, including retroactive monthly payments going back to May 15, 2004. Id. ¶ 3(a). Exxon was required to make this monthly payment until Exxon reasonably determined that it no longer needed access to the entire premises and that plaintiff could lease the premises for use as a service station. Id. ¶ 3(d). Once Exxon no longer needed to access to the entire premises, it was only required to pay a portion of the rent attributable to the percentage of the premises that Exxon would use. Id. ¶ 3(d).

The Access Agreement provides that "[i]f [Exxon] undertakes any remediation," it will continue such remediation until the applicable governmental agencies indicate that no further remediation is required and issue a "closure letter" indicating that the "Spill Number" has been removed. Id. ¶ 1(b). Exxon was required to provide plaintiff with copies of all environmental test results "which Exxon Mobil files" with any governmental agency. Id. ¶ 1(c).

Exxon retained the sole right to negotiate with any governmental agency concerning a remediation plan for the premises provided that "the execution of said plan does not diminish the value of the Premises." Id. ¶ 1(e).

Paragraph five of the Access Agreement, which discusses the USTs, states:

> In addition to the parties' rights under the Lease, in order to perform remediation required by any Governmental Authority, [Exxon] may use, move, remove, or alter any building, structure, curbing, pavement, driveway, improvement, machinery, or other equipment located on the Premises without incurring any liability to [plaintiff] therefor provided it restores any building, machinery, equipment and other facilities necessary for the preservation of the use of the Premises as a gas service station in accordance with the requirements of the Board of Standard Appeals or other applicable governmental authority. Those items which [Exxon] does not remove belong to [plaintiff]. *The tanks and lines shall remain on the Premises and be purchased by [plaintiff] for the nominal*

> *consideration of $10.00 subject to the terms of a bill of sale provided by Exxon Mobil to Owner*, provided, however, that the [Small Tanks] located adjacent to the [Large Tanks system] shall be removed, if feasible, as part of the remediation undertaken by [Exxon] in accordance with the requirements of the [DEC]. With regard to the determination of whether it is feasible to remove the [Small Tanks], feasibility shall be based upon structural concerns, minimizing damage to the improvements on the Premises, and similar matters rather than the cost of removal. If such removal is not feasible, then [Exxon] and [plaintiff] agree that [Exxon] may abandon such tanks in place in accordance with the requirements of, and with the approval of, the [DEC]. . . .

Id. ¶ 5 (emphasis added).

### *4. Exxon's Attempted Sale of the USTs*

Shortly after the Access Agreement was signed, but before any remediation work had begun or Exxon had signed the consent order, Exxon attempted to sell the Large Tanks to plaintiff. PAC ¶¶ 86, 90. The proposed bill of sale offered by Exxon included a provision that required plaintiff to "agree[] that any leak or overfill discharge discovered at any time after the effective date of [the] bill of sale shall be [plaintiff's] responsibility and shall be deemed to have occurred after ownership of [Exxon's] interest in the tanks and lines passed to [plaintiff]."[6] Id. ¶ 87. Plaintiff alleges that Exxon sought to sell plaintiff the Large Tanks pursuant to the above bill of sale because that would have enabled Exxon to shift the cost of the remediation to plaintiff. Id. ¶¶ 89, 91, 102.

Plaintiff declined Exxon's repeated attempts to sell the Large Tanks. See id. ¶¶ 98–99. Exxon began remediation work in the Spring of 2007. Id. ¶ 90.

---

[6] Attached to plaintiff's complaint is a bill of sale with different terms. However, even that bill of sale required plaintiff to release, indemnify, and hold Exxon harmless for any existing or future liability stemming from plaintiff's acquisition or use of the USTs. Young Decl., Ex. O.

*5. Remediation and Removal of the USTs*

On January 6, 2006, a GSC employee informed Durnin, via email, that the Access Agreement had been finalized and that pursuant to the agreement, the USTs were to remain on the premises. Id. ¶ 93. Durnin responded that leaving the USTs in the ground would "change the approved CAP and [USTDP]." Id.

On July 14, 2006, Durnin wrote to Winsor about the results of a survey conducted in May 2006. Id. ¶¶ 94–95. In this letter, "[Durnin] noted that years of monitoring data had shown contaminants on the site and [that] removal of all USTs was required." Id. The letter, however, also indicates that Durnin would permit any UST to remain if Exxon could show that it had not contaminated the soil adjacent to or below it.[7] Id.

Exxon never attempted to demonstrate to DEC that the Large Tanks were not contaminating the soil. Id. ¶ 96. In addition, Exxon never presented DEC with any alternative remediation plan that provided for preserving the Large Tanks and never asked to alter or modify the CAP to allow those tanks to remain. Id. ¶ 69.

In April 2007, Exxon solicited bids from three vendors who all responded that it was not technically feasible to remove the Small Tanks without damaging the Large Tanks. Id. ¶ 106.

Between May and August 2007, Exxon removed all of the USTs, three hydraulic lifts, and 1,326 tons of soil. Id. ¶¶ 110–11. In May 2008, Exxon determined that it no longer needed exclusive access to the premises and, therefore, ceased paying $13,750 per month to plaintiff. Id. ¶ 118. Exxon then began tendering $83.50 per month for limited access, presumably related to equipment for continued monitoring. Id.

In December 2008, DEC officially closed its spill inquiry for the premises. ¶ 113.

---

[7] This allegation, along with Exxon's consideration of the remediation system plan after DEC approved the CAP and USTDP, indicates that the approved CAP and USTDP, which called for removal of all of the USTs, was not "set in stone," as plaintiff at times implies.

**B.      Procedural History**

*1. The Parties' Breach of Contract Claims*

Plaintiff's original complaint, which was filed on March 9, 2009, asserts three claims for breach of contract. These claims are largely similar to the three breach of contract claims raised in the PAC.

First, plaintiff alleges that Exxon breached the Access Agreement when it ceased tendering full rental payments in May 2008 because the Access Agreement required full rental payments until plaintiff was able to use the premises as a gasoline service station. Compl. ¶ 18; PAC ¶ 118. According to plaintiff, the premises cannot be used as a gasoline service station due to Exxon's removal of the buildings, machinery, and equipment, and subsequent refusal to repair and restore those items. Compl. ¶¶ 15–20; PAC ¶¶ 115–20. As part of this claim, plaintiff alleges that its damages will continue to accrue monthly until the premises can be used as a gasoline service station. Compl. ¶ 20; PAC ¶ 120.

Second, plaintiff alleges that Exxon breached the Lease and the Access Agreement by damaging and removing buildings, machinery, and equipment, and refusing to repair and restore those items.[8] Compl. ¶¶ 21–25; PAC ¶¶ 121–27.

Third, plaintiff alleges, in sum and substance, that Exxon's delay in restoring the premises breached the Lease, and that, because of the delay, the premises can no longer be lawfully used as gasoline service station. Compl. ¶¶ 26–28; PAC ¶¶ 128–130.

On June 1, 2009, Exxon filed counterclaims, alleging that plaintiff breached the Access Agreement by refusing to purchase the Large Tanks when Exxon tendered the bill of sale in December 2005. Def.'s Am. Answer ¶¶ 49–50, ECF No. 7. According to Exxon's counterclaim,

---

[8]  As part of this claim, the PAC adds new paragraphs alleging that Exxon entered into the Access Agreement with no intention of performing its obligations. PAC ¶¶ 123, 126.

on July 14, 2006, DEC "required Exxon to remove all [USTs] on the Premises." Id. ¶ 53. Thus, Exxon maintains that if plaintiff had fulfilled its obligations under the Access Agreement and purchased the Large Tanks when Exxon tendered the bill of sale: (1) Exxon would have removed the Small Tanks and completed its remediation efforts by May 14, 2006; and (2) plaintiff, rather than Exxon, would have shouldered the $260,000 cost of removing the Large Tanks. Id. ¶¶ 61, 65.

### 2. Subsequent Events during Litigation

On July 14, 2009, I approved the parties' joint discovery plan, pursuant to which, "[t]he parties agree[d] that any motion to . . . amend their respective pleadings shall be made by August 15, 2009." ECF Nos. 9–10.

In a letter dated June 25, 2009, Durnin provided Nat Castagna with a chronology of events regarding DEC's involvement with the premises. June 25, 2009, Ltr., Decl. of Beth L. Kaufman in Opp. to Pl.'s Mot. for Leave to Amend the Compl. ("Kaufman Decl."), Ex. 7, ECF Nos. 76. The letter recounted that in December 2004, GSC had submitted a USTDP to DEC that "proposed divestiture activities for the closure and removal of the gasoline USTs, filling and dispensing systems," and that DEC had approved the USTDP and Exxon's proposed CAP in March 2005. Id. Thus, by June 25, 2009, plaintiff was aware that Exxon had submitted, and that DEC had approved, a USTDP that proposed removing all of the USTs from the premises. The June 25, 2009, letter also explicitly states that DEC's August 30, 2004 letter requested a CAP. Id.

In or around February 2010, plaintiff's counsel retained another firm, Young & Young, LLP, on an "of counsel" basis to assist in the review of approximately 5,000 pages of documents that Exxon had produced on January 25, 2010. ECF Nos. 14, 16. In an April 13, 2010, letter seeking an extension of the discovery deadline, plaintiff's counsel informed the Court that

plaintiff had recently completed reviewing Exxon's document production and would seek to file an amended complaint raising a fraud claim because some of those documents indicated that, prior to the execution of the Access Agreement, Exxon had already agreed with DEC to remove all of the USTs. ECF No. 16. Plaintiff's counsel, however, intended to refrain from seeking leave to amend until a privilege dispute between the parties was resolved. Id. After the parties conferred and narrowed the privilege dispute, ECF No. 22, the Court resolved the remaining privilege issues in an order dated September 22, 2010, ECF No. 27.

While the privilege dispute was ongoing, plaintiff raised a number of issues concerning Exxon's document production, which culminated in plaintiff making a motion to compel in December 2010. ECF Nos. 25, 28, 29. Plaintiff's motion to compel argued, inter alia, that Exxon failed to produce certain emails and attachments and that, in Exxon's production, there was a five-month gap in emails between August and December 2003. Pl.'s Mem. of Law in Supp. of Mot. to Compel ("Mot. to Compel") at 9–11, ECF No. 29.

Exxon opposed the motion to compel and filed its own motion to strike plaintiff's expert report, which was submitted in support of the motion to compel. Exxon's Notice of Mot. to Strike Opinion of Yalkin Demirkaya, ECF No. 36. In an order dated April 1, 2011 ("April 1, 2011, Order"), I denied plaintiff's motion, granted Exxon's motion, and awarded Exxon its attorney's fees and costs for the motions. ECF No. 44. In denying plaintiff's motion, the April 1, 2011, Order concluded, inter alia, that the primary purpose of plaintiff's motion was to obtain discovery regarding plaintiff's unpleaded fraud claim and that plaintiff was not entitled to documents predating May 2004.[9] Exxon was awarded fees and costs because plaintiff's motion to compel was "essentially duplicative of the Court and the parties' efforts to resolve this same

---

[9] The April 1, 2011, Order erroneously stated that the Access Agreement was executed in May 2004. However, the April 1, 2011, Order clearly intended to preclude documents pre-dating May 2004 because that is when the parties began negotiating the Access Agreement.

dispute months ago." Id. at 14. During conferences held in August and October 2010, I had explained to plaintiff that it was not entitled to discovery on an unpleaded fraud claim. Kaufman Decl. ¶ 10.

Shortly after I issued the April 1, 2011, Order, plaintiff filed an objection to the order and filed a pre-motion conference letter before Judge Garaufis seeking leave to amend the complaint to add a fraud claim. ECF Nos. 47, 48. On May 19, 2011, Judge Garaufis granted plaintiff permission to file a motion for leave to amend, which was ultimately filed on September 23, 2011. Minute Entry dated May 19, 2011; ECF Nos. 71–77. On November 17, 2011, Judge Garaufis referred the motion to me "for decision pursuant to 28 U.S.C. § 636(b)(I)(A) and Federal Rule of Civil Procedure 72(a)." ECF No. 79.

While the objection and motion for leave to amend were being briefed, the parties completed, with a single exception, all depositions. Kaufman Decl. ¶¶ 7, 12. The lone remaining deposition was presumably completed before the end of 2011.

### 3. Plaintiff's Motion for Leave to Amend

Plaintiff's proposed fraud claim, which is based on numerous new factual allegations, asserts that Exxon had a duty to disclose the Omissions because: (1) Exxon had a fiduciary duty to plaintiff; and (2) Exxon had superior knowledge, which was not readily available to plaintiff, of the Omissions and knew that plaintiff was acting on the basis of mistaken knowledge. PAC ¶¶ 132–34.

According to plaintiff, "[a]s a result of Exxon's fraudulent concealment, Plaintiff was fraudulently induced to enter into the Access Agreement and delay in renewing its Certificate of Occupancy for the Premises." Id. ¶ 137. Plaintiff also alleges that Exxon's failure to disclose information concerning the remediation "has directly damaged Plaintiff in that the Certificate of

Occupancy lapsed resulting in the Premises no longer able to be lawfully maintained as a gasoline service station."  Id. ¶ 138.

According to plaintiff, "the crux of [its] proposed fraud claim" is "that despite the fact that Exxon knew that the Large Tanks were required to be removed pursuant to plans filed with the [DEC] as possibly contributing to contamination, Exxon intentionally failed to disclose this information to Plaintiff . . . .[and] [i]nstead Exxon fraudulently attempted to sell the Large Tanks to Plaintiff pursuant to a bill of sale in an attempt to shift the entire cost of the remediation to Plaintiff."  Pl's Reply Mem. in Further Supp. of Mot. for Leave to File Am. Compl. ("Pl.'s Reply Mem.") at 1, ECF No. 77; see also Pl.'s Mem. at 1 ("Exxon intentionally withheld material information concerning the remediation in an effort to fraudulently induce Plaintiff to 'purchase' the remediation and get stuck with all remediation costs.").

Exxon argues that plaintiff's motion should be denied because plaintiff's proposed amendment was unduly delayed and brought in bad faith, and is also futile.  In support of these arguments, Exxon relies on documents and deposition testimony that are not attached to the PAC.

## II.    DISCUSSION

### A.    Standard for Motion to Amend

In order to amend its complaint, plaintiff requires the court's leave, which should be granted "freely . . . where justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

**B.      Undue Delay under Rule 15(a) and Good Cause under Rule 16(b)**

The Second Circuit has "held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion."  Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000) (citation omitted); see also Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d 321, 333 (2d Cir. 2000) ("Parties are generally allowed to amend their pleadings absent bad faith or prejudice." (citing State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981))).  However, where the court has issued a scheduling order under Federal Rule of Civil Procedure 16(b), Rule 16(b) must also be considered in analyzing a motion to amend.

Rule 16(b) directs district courts to issue a scheduling order at the outset of a case limiting "the time to join other parties, amend the pleadings, complete discovery, and file motions."  Fed. R. Civ. P. 16(b).  This schedule "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "Rule 16(b) serves an important function in ensuring fairness, certainty, and expedition of litigation."  Sokol Holdings, Inc. v. BMB Munai, Inc., No. 05 Civ. 3749, 2009 WL 3467756, at *6 (S.D.N.Y. Oct. 28, 2009) (citing Parker, 204 F.3d at 340).

A party can establish good cause under Rule 16(b) by showing that the deadline at issue "'cannot reasonably be met despite the diligence of the party seeking the extension.'"  Parker, 204 F.3d at 340 (quoting Fed. R. Civ. P. 16 advisory committee's note (1983 amendment, discussion of subsection (b)).  "[T]he good cause standard is not satisfied when the proposed amendment rests on information 'that the party knew, or should have known, in advance of the deadline.'"  Lamothe v. Town of Oyster Bay, No. 08 Civ. 2078, 2011 WL 4974804, at *6 (E.D.N.Y. Oct. 19, 2011) (quoting Sokol Holdings, Inc. v. BMD Munai, Inc., No. 05 Civ. 3749,

2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009) (Freeman, Mag. J.), aff'd, 2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009)).

Despite the liberal standard for amendment under Rule 15(a), a district court may, in its discretion, deny "leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." Parker, 204 F.3d at 340. When both Rule 15(a) and Rule 16(b) are implicated, the Second Circuit has directed that "the primary consideration is whether the moving party can demonstrate diligence." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007) (addressing application of Rule 16(b) to situation where Rule 15(a) would otherwise permit amendment as of right). In exercising its discretion under Rule 16(b), a district court "may [also] consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." Id.; see also Holmes v. Grubman, 568 F.3d 329, 334–35 (2d Cir. 2009) (affirming denial of motion to amend where plaintiff failed to establish good cause and stating that the lenient standard under Rule 15(a) "must be balanced against" Rule 16(b)'s good cause requirement) (quoting Grochowski v. Phoenix Constr., 318 F.3d 80, 86 (2d Cir. 2003)). Even where the prejudice to the non-moving party "may well be minimal," a failure to show good cause can warrant denial of a motion to amend. Oppenheimer & Co. Inc. v. Metal Mgmt., Inc., No. 08 Civ. 3697, 2009 WL 2432729, at *4 (S.D.N.Y. July 31, 2009) (Maas, Mag. J.), aff'd, 2010 WL 743793 (S.D.N.Y. Mar. 2, 2010).

Plaintiff cannot establish good cause for failing to raise its claims based on Omissions #1, 2, 3, 4, and 7 prior to the August 15, 2009, deadline for amending the pleading. Those claims essentially concern information contained in formal written correspondence between DEC and

Exxon,[10] and plaintiff either knew, or should have known, of the relevant information before the August 15, 2009 deadline. Critically, Durnin's June 25, 2009, letter to Nat Castagna revealed the factual basis for the "crux" of plaintiff's fraud claim. Therefore, plaintiff's motion to amend is denied as to these claims.

Plaintiff argues that it has established good cause because it first learned of the facts forming the basis of its fraud claim in discovery. Pl.'s Reply Mem. at 3 n.1. According to plaintiff, "it was not until Plaintiff pieced together Exxon's incomplete document production that Plaintiff first learned that Exxon had an approved CAP and USTDP with [DEC] which required removal of all USTs, including the Large Tanks it was trying to sell to Plaintiff, some eight months prior to Exxon's execution of the Access Agreement." Id. at 4.

Plaintiff, however, simply ignores Durnin's June 25, 2009, letter, which indicates that, in March 2005, DEC had approved Exxon's USTDP, which proposed "removal of the gasoline USTs, [and] filling and dispensing systems." Thus, plaintiff was aware of the factual basis for the "crux" of its fraud claim seven weeks prior to the August 15, 2009, deadline for filing motions to amend the pleadings, and over nine months before plaintiff's April 13, 2010, letter that first raised the prospect of a fraud claim.[11] Given the June 25, 2009, letter, plaintiff cannot

---

[10] Although plaintiff attached copies of certain correspondence between Exxon and DEC to its complaint, plaintiff did not include copies of the letters between DEC and Exxon dated November 4, 2004, December 10, 2004, and March 14, 2005. Plaintiff, however, previously submitted copies of these documents to the Court in support of its motion to compel. See Reply Decl. of Richard W. Young, ECF No. 30, Ex. C (Nov. 5, 2004, letter), Ex. D (Dec. 10, 2004, letter and attached USTDP indicating that the Large Tanks would be removed), Ex. F (Mar. 14, 2005, letter indicating that "the CAP includes a plan to remove the [USTs]").

[11] Any potential arguments that plaintiff could have raised regarding the import of the June 25, 2009, letter would be meritless. First, the June 25, 2009, letter's reference to "the gasoline USTs, [and] filling and dispensing systems" clearly encompasses the Large Tanks. Second, although the June 25, 2009, letter does not explicitly state that Exxon's proposed CAP also called for removal of all of the USTs, the letter's disclosure of the substance of the USTDP was sufficient to establish the factual basis for the "crux" of plaintiff's fraud theory.

show good cause as to Omission #2—the lynchpin of its fraud claim.[12]  See Oppenheimer, 2009 WL 2432729, at *3 (denying motion to amend answer and finding no good cause where, even though recently produced documents "may further have underscored the potential viability of [plaintiff's] waiver argument, the [waiver] issue was not new").

Plaintiff has also failed to show good cause as to Omissions #1, 3, 4, and 7.  Plaintiff appears to have obtained DEC's July 14, 2006, letter—the basis for Omission #7—before the August 15, 2009 deadline.  In a letter from Kramer to Durnin dated October 5, 2006, Kramer requested a copy of the July 14, 2006, letter through the Freedom of Information Act ("FOIA"), see Oct. 5, 2006, Ltr., Kaufman Decl., Ex. 9, and Durnin's deposition testimony suggests that Kramer's request was granted, see Durnin Dep. 140, Reply Decl., Ex. C (stating that he faxed this letter to Kramer).[13]  Plaintiff offers no contrary evidence concerning either Kramer's October 5, 2006, letter or Durnin's apparent response.  In addition, there is no evidence in the record that, either before filing the original complaint or after receiving the June 25, 2009, letter, plaintiff acted diligently to obtain, through either a FOIA request or other means available to it as owner of the premises, relevant documents concerning the premises from DEC.  Presumably,

---

[12]  Although not necessary to my conclusion that good cause is lacking here, I note that plaintiff's first mention of a potential fraud claim in its April 13, 2010, letter coincides with the retention of additional counsel by plaintiff. Because the June 25, 2009, letter revealed the factual basis for plaintiff's fraud claim, the timing of the April 13, 2010, letter suggests that plaintiff's decision to raise the prospect of a fraud claim in April 2010 may have had more to do with a strategic shift by new counsel than the discovery that plaintiff had recently obtained.  Cf. Holland v. Goord, No. 05-CV-6295, 2010 WL 3946297, at *3–4 (W.D.N.Y. Aug. 17, 2010) (report and recommendation holding that prior counsel's failure to recognize the applicability of a defense failed to establish good cause), adopted by, 2010 WL 3946292 (W.D.N.Y. Oct. 8, 2010).

[13]  Although the June 25, 2009, letter, the October 5, 2006, letter, and Durnin's deposition testimony are not mentioned in the PAC, that evidence can, of course, be considered in determining whether plaintiff's proposed amendments should be permitted under Rule 15(a) and Rule 16(b).

such requests would have yielded the documentation underlying Omissions #1, 3, and 4, such as DEC's August 30, 2004, letter, and the Notice of Violation concerning the lines.[14]

It should also be noted that, even after plaintiff reviewed Exxon's January 2010 production (and, according to plaintiff, first learned of the Omissions), plaintiff further delayed filing a motion to amend its complaint and instead sought to compel discovery on its unpleaded fraud claim despite being informed by the Court that such discovery was impermissible. This strategy contributed to an unnecessary delay of these proceedings for at least six months and further supports denial of plaintiff's motion to amend.

Although the potential prejudice to defendant may be minimal, plaintiff's motion to amend its complaint to add fraud claims concerning Omissions #1, 2, 3, 4, and 7 is denied. See Oppenheimer, 2009 WL 2432729, at *4 (denying motion to amend, which was filed seven months after amendment deadline, based on failure show good cause even though discovery in case was not complete and prejudice to non-moving party "may well be minimal"). Additionally, as explained below, plaintiff's claims concerning all of the Omissions are also futile.

## C.      Futility

### 1. Standard

A proposed amendment to a pleading is considered futile if it "could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Dougherty v. Town of North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

---

[14] Some of the information underlying Omission #5—specifically, the fact that one remediation option involved removal of all of the USTs—was also discussed in the correspondence between DEC and Exxon concerning the proposed CAP and USTDP. Therefore, plaintiff has also failed to show good cause regarding its claims based on that information.

In analyzing a motion to dismiss under Rule 12(b)(6), the court is required to accept as true "all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 270–71 (2d Cir. 2011).

Under Ashcroft v. Iqbal:

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.

556 U.S. 662, 678 (2009) (citations and internal marks omitted).

Iqbal sets out a two-pronged approach to reviewing a motion to dismiss. First, a court is not required to accept as true a complaint's legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citation omitted). Second, a court must be satisfied that the complaint "state[s] a plausible claim for relief." Id. at 679 (citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

*2. Consideration of Matters Extraneous to the Complaint*

The general rule is that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). A court, however, may consider documents attached to the complaint without converting the motion. <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted). The above principles are generally applicable when a court is tasked with making futility determinations in the context of a motion to amend. <u>See</u> <u>Contractual Obligation Prods., LLC v. AMC Networks, Inc.</u>, No. 04 Civ. 2867, 2006 WL 6217754, at *3 (S.D.N.Y. Mar. 31, 2006).

In arguing that plaintiff's proposed fraud claims are futile, Exxon relies on documents and deposition testimony submitted in its opposition papers that would ordinarily not be considered. Therefore, the futility analysis below is based on the facts set out in the PAC and the exhibits attached thereto. Based on those facts, the amended complaint is futile.

*3. Elements of a Fraud Claim*

Under New York law, fraud requires that "the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 181 (2d Cir. 2007) (citations omitted). Where a plaintiff seeks to show fraud by omission, it must also prove that the defendant had a duty to disclose the concealed fact. <u>Id.</u> (citation omitted).

Plaintiff has failed to allege any detrimental reliance linked to Omission #7 or Exxon's failure to disclose the other Omissions after the execution of the Access Agreement. With regard to Omissions #1, 2, 3, and 4, plaintiff has failed to plausibly allege reasonable reliance or a duty disclose. Plaintiff's claim based on Omission #6 fails because it is duplicative of plaintiff's

breach of contract claims. Finally, plaintiff's claim concerning Omission #5 is futile on a number of different grounds.

### 4. *Detrimental Reliance*

"An essential element of any fraud . . . claim is that there must be reasonable reliance, to a party's detriment, upon the representations made." <u>Water Street Leasehold LLC v. Deloitte & Touche LLP</u>, 19 A.D.3d 183, 185 (N.Y. App. Div. 1st Dep't 2005) (citation omitted). "'[P]laintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation).'" <u>Id.</u> (quoting <u>Laub v. Faessel</u>, 297 A.D.2d 28, 31 (N.Y. App. Div. 1st Dep't 2002)).

Plaintiff alleges that Exxon's failure to disclose the Omissions fraudulently induced it to "delay in renewing its Certificate of Occupancy." PAC ¶ 137. Exxon, however, argues that plaintiff has failed to plead any detriment linked to that delay because plaintiff has neither alleged that it applied to renew its Certificate of Occupancy nor that any such application was denied. Def.'s Mem. in Opp. to Pl.'s Mot. for Leave to Amend the Compl. ("Def.'s Mem.") at 20–21. Plaintiff responds that it has alleged a detriment, namely, that the premises' Certificate of Occupancy and variance lapsed because the premises were not used as a gasoline service station for a continuous period of two years. Pl.'s Reply Mem. at 6.

The flaw in plaintiff's argument is that, although the variance and Certificate of Occupancy lapsed, the PAC does not plausibly suggest that this occurred because of plaintiff's delay in renewing the Certificate of Occupancy. Nothing in the PAC or plaintiff's papers indicates that, if plaintiff had sought to renew the Certificate of Occupancy sooner, that action

could have prevented the CO and variance from lapsing or could have otherwise remedied the lapse.

The PAC alleges that Exxon's removal of all of the USTs could cause the loss of the premises' Certificate of Occupancy, PAC ¶ 39; however, nothing in the PAC suggests that plaintiff's delay in renewing its Certificate of Occupancy was a cause of that loss. In its reply brief, plaintiff raises a different argument, contending that Exxon's failure to disclose induced plaintiff into executing the Access Agreement, and that the variance and Certificate of Occupancy lapsed because the Access Agreement "result[ed]" in the premises not being used as a gasoline service station for more than two years. Pl.'s Reply Mem. at 6. However, plaintiff's delay in renewing its Certificate of Occupancy is completely absent from this theory of detrimental reliance, and none of the additional evidence that plaintiff submitted concerning the variance and Certificate of Occupancy, see supra n.3, fills this gap.

Because plaintiff has failed to allege any link between its delay in renewing the Certificate of Occupancy and the lapse of the Certificate of Occupancy and variance, plaintiff's only potentially viable claims concern the Omissions that allegedly induced plaintiff into executing the Access Agreement. Any claim involving Exxon's failure to disclose information after the execution of the Access Agreement must be dismissed. This includes plaintiff's claim concerning Omission #7, which is premised on Exxon's failure to disclose DEC's July 14, 2006, letter—a letter that was not sent until six months after the Access Agreement was signed.

*5. Duty to Disclose / Reasonable Reliance*

For claims of fraudulent concealment,

> New York recognizes a duty by a party to a business transaction to speak. . . when the parties stand in a fiduciary or confidential relationship with each other; and . . . where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

Brass v. Am. Film Techns., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

a. Fiduciary Duty

"A fiduciary duty arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." Sotheby's, Inc. v. Minor, No. 08 Civ. 7694, 2009 WL 3444887, at *9 (S.D.N.Y. Oct. 26, 2009) (citations and internal marks omitted).

In its opening brief, plaintiff notes that a contract may create a fiduciary relationship if the contract "establishes a relationship of trust and confidence between the parties." Pl.'s Mem. at 14 (quoting St. John's Univ. v. Bolton, 757 F. Supp. 2d 144, 166 (E.D.N.Y. 2010)). However, outside of this single sentence, plaintiff does not address this issue further and never even identifies which of the contracts at issue (the lease or the Access Agreement) gave rise to the alleged fiduciary relationship. That alone suffices to reject this argument. Moreover, even if plaintiff had pursued this issue, nothing in the lease suggests a relationship of trust and confidence that extended past the expiration of the lease and into the period in which the parties negotiated the Access Agreement. See Lease dated Mar. 7, 1984, Young Decl., Ex. C. As such, plaintiff has failed to plead a fiduciary relationship for the purposes of its claim that the Omissions induced it to execute the Access Agreement. It is unnecessary to determine whether the Access Agreement gave rise to a fiduciary relationship because, as explained earlier, plaintiff

has failed to allege that it was induced into any detrimental acts or omissions after the execution of the Access Agreement.

        b.   Superior Knowledge and Reasonable Reliance

Under New York law, a duty to disclose may arise where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. Brass, 987 F.2d at 150. According to Brass, although "[i]n general" information is considered "readily available" in cases "where a buyer has an opportunity equal to that of a seller to obtain information," "in an increasing number of situations, a buyer is not required to conduct investigations to unearth facts and defects that are present, but not manifest" and "may safely rely on the seller to make full disclosure." Id. at 151.

Exxon argues that plaintiff's conclusory allegation that the undisclosed information at issue was not readily available is insufficient to establish a duty to disclose in light of the allegations in the PAC and Exxon's additional evidence. Again, the additional evidence submitted by Exxon is beyond the scope of the PAC and will not be considered. Nevertheless, plaintiff has still failed to plausibly plead a duty to disclose or reasonable reliance as to Omissions #1, 2, 3, and 4. Although Exxon does not raise this argument, I find that the instant suit is analogous to cases where the critical information at issue was available in public records. The PAC and the documents attached thereto indicate that all of the important information underlying the omissions at issue was contained in correspondence between DEC and Exxon— records that were presumably available to plaintiff upon request. Although the question of "[w]hether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination

on a motion to dismiss," <u>Doehla v. Wathne Ltd., Inc.</u>, No. 98 Civ. 6087, 1999 WL 566311, at *10 (S.D.N.Y. Aug. 3, 1999), plaintiff's claim must still be plausible.

A plaintiff cannot establish justifiable reliance or a duty to disclose where the information at issue was a matter of public record that could have been discovered through the exercise of ordinary diligence. <u>See</u> <u>Barrett v. Freifeld</u>, 77 A.D.3d 600, 601 (N.Y. App. Div. 2d Dep't 2010) (affirming grant of summary judgment and finding no duty to disclose where arrest of seller of business "was a matter of public record which could have been discovered through the exercise of ordinary diligence and, thus, the plaintiff did not justifiably rely on [accountant] to disclose that information"); <u>Urstadt Biddle Props., Inc. v. Excelsior Realty Corp.</u>, 65 A.D.3d 1135, 1137 (N.Y. App. Div. 2d Dep't 2009) (affirming grant of summary judgment on misrepresentation claim where zoning status of property and tax assessment were matters of public record); <u>Alpha GmbH & Co. Schiffsbesitz KG v. BIP Indus. Co.</u>, 25 A.D.3d 344, 345 (N.Y. App. Div. 1st Dep't 2006) (affirming grant of summary judgment on fraudulent concealment claim where "[t]he parties, businesses on opposite sides of a transaction, and each represented by counsel, were not in a confidential or fiduciary relationship, and the allegedly concealed information, plaintiff's insolvency and dissolution, were matters of public record that defendant could have discovered by the exercise of ordinary diligence"); <u>but see</u> <u>Todd v. Pearl Woods, Inc.</u>, 20 A.D.2d 911 (N.Y. App. Div. 2d Dep't 1964) (affirming denial of summary judgment where defendant made misrepresentations regarding sewer system for homes in housing development and concluding that because "the facts [at issue] were peculiarly within the knowledge of the defendants and were willfully misrepresented, the failure of the plaintiffs to ascertain the truth by inspecting the public records is not fatal to their action"), <u>aff'd</u>, 15 N.Y.2d 817 (1965).

Moreover, even without the benefit of Iqbal, courts have granted motions to dismiss where the information at issue was available in public records. See Wildenstein v. 5H & Co, Inc., 97 A.D.3d 488, 950 N.Y.S.2d 3, 6 (N.Y. App. Div. 1st Dep't 2012) (reversing denial of motion to dismiss where defendant's misrepresentations concerning architect and home improvement contractor licenses could have been verified through public records); Clearmont Prop., LLC v Eisner, 58 A.D.3d 1052, 1056 (App. Div. 3d Dep't 2009) (affirming grant of motion to dismiss where seller represented that he owned property and contract noted that the property was tax exempt, raising a question as to the reason for the property's tax exempt status, but buyer failed to investigate public records regarding ownership); Gen. Motors Corp. v. Villa Marin Chevrolet, Inc., Nos. 98-CV-5206, 98-CV-5208, 98-CV-6167, 99-CV-3750, 2000 WL 271965, at *28–32 (E.D.N.Y. Mar. 7, 2000) (dismissing misrepresentation claims where the information at issue—a certificate of occupancy and a municipal denial of a request to subdivide a tax lot—were contained in publicly available documents and the parties were counseled and sophisticated); Villa Marin Chevrolet, Inc. v. Gen. Motors Corp., 98-CV-6167, 1999 WL 1052494, at *6–7 (E.D.N.Y. Nov. 18, 1999) (dismissing related fraud claims based on failure to establish reasonable reliance or a duty to disclose); but see Brass, 987 F.2d 152 (reversing grant of motion to dismiss where, although investor, who was apparently uncounseled, could have learned about restraint on alienation of securities from the SEC, defendant's "conduct taken as a whole . . . strongly implied that the stock . . . could be freely traded.").

Omissions #1, 2, 3, and 4 were essentially all contained in written correspondence between DEC and Exxon. If plaintiff had undertaken the minimal effort of requesting records concerning the premises from DEC—records that plaintiff was presumably entitled to obtain—it would have discovered the information above. Plaintiff was the owner of the premises

throughout the relevant time period and it (and likely any interested member of the public) was presumably entitled to obtain copies of that documentation from DEC. Thus, plaintiff's conclusory assertion that this information was not readily available is insufficient to plausibly plead a viable fraud claim.

Only one factual allegation raised by plaintiff is potentially relevant to this issue. Plaintiff argues that an internal Exxon email, dated April 21, 2005, "explicitly noted that [DEC] would only discuss with Plaintiff granting [Exxon] access to the site and not the requirement that the tanks be removed."[15] Pl.'s Reply Mem. at 8 n. 3.[16] However, plaintiff's interpretation of this email—that DEC had already imposed a requirement that the USTs be removed and was not going to disclose that requirement to plaintiff—is implausible in light of later statements in that same email as well as subsequent internal Exxon emails. The April 21, 2005, email goes on to state that "it is a business decision to re-open or pull tanks." PAC ¶ 64. Similarly, in May and June 2005, Exxon employees compared the costs of two remediation plans—one of which involved preserving all of the USTs. Obviously, these alternatives would not have been considered if DEC had already mandated that the USTs be removed. More importantly, even

---

[15] Plaintiff also argues that, although Exxon was required under the Access Agreement, to forward plaintiff information about the remediation, Exxon never did so. Pl.'s Reply Mem. at 8 n.3. However, any violation of the Access Agreement is irrelevant to plaintiff's claim that Exxon's failure to disclose fraudulently induced it to execute the Access Agreement. Moreover, Exxon's failure to disclose information to Nat Castagna in 2004 after he contacted GSC (which plaintiff perplexingly cites to in support of the argument above) is irrelevant to the question of whether the documents at issue were available from DEC.

[16] The full text of this email states:

> Recommend waiting for the [DEC] attorney (Lou Oliva) to contact [plaintiff's] attorney regarding access, before placing a dealer under agreement to re-open. The [DEC] is only going to discuss granting [Exxon] access to the site, not requiring the tanks to be removed. We should hear back in a week. Ultimately, it is a business decision to re-open or pull tanks. If the NYDEC places pressure on the [plaintiff] for access, maybe the [plaintiff] will want to have the tanks removed.

PAC ¶ 64.

accepting plaintiff's interpretation of the April 21, 2005, email, that still would not plausibly suggest that the written documentation on file with DEC was not accessible to plaintiff upon request.

Finally, the facts alleged by plaintiff do not plausibly suggest that this is a situation where plaintiff might be excused from engaging in the minimal diligence of requesting written records about the spill investigation from DEC. Although plaintiff was presumably not a sophisticated party with repeat experience in this type of transaction, plaintiff had counsel, and—in light of its knowledge that there was a DEC investigation into potential contamination and the fact that the Access Agreement contemplated it purchasing the Large Tanks at an unspecified time pursuant to a bill of sale with unspecified terms—was on notice that it could potentially be exposed to environmental liabilities associated with the Large Tanks.[17]

Plaintiff's claims based on Omissions #1, 2, 3, and 4 are futile because plaintiff has not plausibly pled that the information underlying those omissions was not readily available.

### 6. Viability of Plaintiff's Parallel Fraud and Contract Claims

"[U]nder New York law, parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 183–84 (2d Cir. 2007) (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).

Where a defendant is alleged to have misrepresented or failed to disclose present facts that induced the plaintiff to enter into a contract, such misrepresentations or omissions give rise

---

[17] Any discussion of the Access Agreement in the instant opinion is not intended to express any view on the ultimate merits of the breach of contract claims at issue in this litigation.

to a non-duplicative fraud claim.  Merrill Lynch, 500 F.3d at 183 (holding that fraudulent inducement claim based on representations and omissions related to contractual warranties was not duplicative and drawing analogy to case where a "seller misrepresented facts as to the present condition of his property, even though these facts were warranted in the parties' contract").  However, the Second Circuit has also held that where a defendant fails to disclose that it "never intended to perform its obligations" under a contract, that failure to disclose its "intention to breach is not actionable as a fraudulent concealment."  TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 90 (2d Cir. 2005).

According to Exxon, TVT bars plaintiff's claims that it was induced into signing the Access Agreement by Exxon's pre-Access Agreement failure to disclose its state of mind concerning whether and how it intended to perform under the Access Agreement.

### a.   Omission #6

According to Omission #6, Exxon "chose" the remediation option that involved removal of all of the USTs even though Exxon was aware that this approach would render the premises vacant and no longer operational as a gasoline station.  In essence, plaintiff is alleging that, prior to entering into the Access Agreement, Exxon had already decided on a course of action that would violate the Access Agreement and that Exxon should have disclosed this to plaintiff.[18]

Under TVT, plaintiff's fraud claim based on Omission #6 is duplicative of plaintiff's breach of contract claims, and is, therefore, futile.  See also Marriott Int'l., Inc. v. Downtown Athletic Club of New York City, Inc., No. 02 Civ. 3906, 2003 WL 21314056, at *5–7 (S.D.N.Y. June 9, 2003) (dismissing fraudulent inducement claim where complaint alleged that defendant's

---

[18] Plaintiff's theory on its breach of contract claims suggests that Exxon may have been permitted to remove the Large Tanks provided that it replaced them.  In that case, Omission #6 would be irrelevant because that information merely indicated that Exxon had made a choice permitted by the Access Agreement.  To the extent that Omission #6 could be interpreted to suggest that Exxon had decided to both remove the Large Tanks and to not replace them, Omission #6 would indicate that Exxon intended to breach the Access Agreement.

promise was false at the time it was made because defendant did not intend to honor the contract).

          b.   Omission #5

Omission #5 concerns the two alternative remediation options that Exxon considered between April and June 2005. The fact that Exxon considered these two plans is intertwined with plaintiff's allegation that Exxon ultimately "chose" the UST removal plan (Omission #6). Because a claim based on Exxon's intent to breach the Access Agreement is not viable, Omission #5 is irrelevant to the extent that it sheds light on that intent.

Moreover, plaintiff has failed to plausibly plead any other potential claim based on the information about the remediation system plan that Exxon did not disclose to plaintiff. Although the remediation system plan was not discussed in the DEC records that were presumably available to plaintiff, given the information in the DEC records and the fact that plaintiff had access to the premises, plaintiff could and should have determined, on its own, whether a plan such as the remediation system plan was potentially a viable remediation option. As such, Exxon did not have a duty to disclose this information.

Furthermore, plaintiff has failed to plausibly plead that it would have not entered the Access Agreement if it had known about the remediation system plan. The Access Agreement already provided that the Large Tanks were to remain on the premises and only directed Exxon to remove the Small Tanks if such removal was feasible. The Access Agreement also provided that the execution of any remediation plan that Exxon negotiated with DEC "not diminish the value of the Premises." Access Agreement ¶ 1(e).

**D. Additional Evidence Submitted by Exxon**

For the reasons outlined in the prior section, plaintiffs' motion to amend is denied because the PAC is futile. In addition, evidence submitted by Exxon, to which plaintiff has never explicitly objected, further establishes that plaintiff's proposed claims are meritless.[19]

As Exxon points out, the undisputed evidence in the record reveals that "the possibility that remediation would include removal of all tanks . . . <u>was openly and blatantly discussed and was something of which plaintiff was aware</u>."[20]  Def.'s Mem. at 18 (emphasis in original). Although none of the evidence cited by Exxon establishes that plaintiff was, in fact, aware of the CAP and USTDP, Exxon's evidence still undermines the crux of plaintiff's fraud claim, which asserts that plaintiff would have never agreed to purchase the Large Tanks if it had known that the Large Tanks were potentially contributing to contamination and that DEC had approved Exxon's proposed CAP and USTDP.

Plaintiff already knew that the Large Tanks were possibly defective and that remediation might include their removal (and was surely aware that any remediation associated with the Large Tanks had the potential to be very costly).  In light of that knowledge, and based on the

---

[19]  Plaintiff's only argument related to this issue is a single sentence asserting that the Court should not engage in "fact-finding that is not appropriate" on a motion to amend.  Pl.'s Reply Mem. at 1.

[20]  The additional evidence submitted by Exxon indicates that Kramer, who represented plaintiff during the negotiation of Access Agreement, and Nat Castagna were aware that the Large Tanks were possibly defective and that remediation might include their removal.  <u>See</u> June 8, 2004, Ltr. from Exxon to Kramer at 2 (informing Kramer that it was Exxon's intent to "remove the underground storage tanks and lines as permitted by the lease"), Kaufman Decl., Ex. 12; Aug. 2, 2005, Diary Entry of Leonard Kramer (stating that if "tight tanks" do not "pass test – then will remove [and] not replace"), Kaufman Decl., Ex. 13, ECF No. 82; Aug. 22, 2005, Diary Entry ("Nat has estimate on replacing tanks"), Kaufman Decl., Ex. 13; Kramer Dep. 186 (indicating that Kramer was aware that remediation might include removal of the Large Tanks), Kaufman Decl., Ex. 22, ECF No. 82; Durnin Dep. 139–40 (indicating that Durnin told Nat Castagna that "remediation may include removing tanks from the ground"), Young Reply Decl., Ex. C; <u>cf.</u> Aug. 15, 2006, Ltr. from Kramer to XOM, (post-Access Agreement letter indicating that although Kramer was not aware of the CAP and USTDP at the time of this letter, Kramer still knew that there was a possibility that the Large Tanks were defective, and that any sale of the Large Tanks to plaintiff prior to the completion of the remediation "would have the net effect of shifting Exxon's responsibility to [plaintiff]"), Young Reply Decl., Ex. B.  It should be noted that all of this evidence concerns plaintiff's knowledge (and facts within plaintiff's possession).  Therefore, none of the discovery that plaintiff has sought in its motion to compel would have any bearing on this issue.

current record, there is only one plausible explanation for plaintiff's decision to agree to the provision in the Access Agreement that called for plaintiff to purchase the Large Tanks—plaintiff simply never considered the possibility that Exxon would assert that the Access Agreement obligated plaintiff to purchase the Large Tanks in a manner that would result in the costs of remediation being shifted to plaintiff.[21]  This, however, does not raise an issue of fraud. The critical fact—the terms of the Access Agreement—was known to plaintiff.  If plaintiff erred in analyzing its potential contractual liability under those terms, it is that error, and not Exxon's failure to disclose information about the Large Tanks, that induced plaintiff to enter into the Access Agreement.  Additional information about the Large Tanks and the potential remediation costs associated with them would not have deterred plaintiff from accepting the provision in the Access Agreement that called for plaintiff to purchase the Large Tanks.[22]

Although I would deny plaintiff's motion to amend even without the additional evidence submitted by Exxon, that evidence provides another basis to deny the motion.  In light of this conclusion, it is unnecessary to decide whether plaintiff's amendment was pursued in bad faith.

---

[21]  It appears that the cost of remediation related to the Large Tanks would be shifted to plaintiff if plaintiff purchased the Large Tanks prior to the completion of remediation and/or the bill of sale contained provisions that would render plaintiff liable for remediation costs.

[22]  Plaintiff may have, for reasons not disclosed in the current record, entered into the Access Agreement cognizant that the terms of the Access Agreement could potentially expose it to remediation costs associated with the Large Tanks.  In that case, plaintiff consciously undertook a risk, and its knowledge about the Large Tanks would only underscore that a failure to request all relevant records from DEC would be patently unreasonable.

### III.  CONCLUSION

For the reasons outlined above, plaintiff's motion for leave to amend is denied.


SO ORDERED.

Dated: September 18, 2012
Brooklyn, New York


_____/s/_____
JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE